

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 30, 2013**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| American Housing Foundation, | § | |
| | § | Case No.:  09-20232-RLJ-11 |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Walter O'Cheskey, Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 11-02132-RLJ |
| | § | |
| Koehler, et al, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

### Introduction and Definitions
### of Major Parties

The Court issues its findings of fact and conclusions of law in this adversary proceeding. Trial was held April 8 – 10, 2013 and June 11 – 12, 2013.  Upon conclusion of the trial, the matter was taken under advisement.  The Court's findings and conclusions are based upon the record before the Court and are issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

For purposes of these findings and conclusions, the Court defines certain of the major parties as follows:

- The plaintiff, Walter O'Cheskey, the Liquidating Trustee, will be referred to as the **Trustee**.

- Steve Sterquell, who was the president and principal of the debtor American Housing Foundation, will be referred to as **Sterquell**.

- The defendants Catherine D. Koehler, Maurice Schooler, Mary C. Schooler, Louise Trammell Conley, Mary C. Schooler as Trustee of the Mary C. Schooler Trust, Louise Trammell Conley as Trustee of the Louise Trammell Trust, Schooler Properties, Ltd., JRK-CDK, Ltd., LKC-CDK, Ltd., MKS-CDK, Ltd., LKC-TC, Ltd., Maurice Schooler, Custodian for August Wendt, Maurice Schooler, Custodian for Erin Wendt, Maurice Schooler, Custodian for Koehler Wendt, Cristi Cocke Trammell, and Catherine Suzanne Schooler will be referred to collectively as the **Koehler Related Parties**.

- The defendants Catherine D. Koehler, Maurice Schooler, Mary C. Schooler, and Louise Trammell Conley will, for purposes of this proceeding, be collectively referred to as the **Koehler Family Members**.[1]

- The Mary C. Schooler Trust, the Louise Trammell (Conley) Trust, the Teresa Joan Koehler Graham Trust, and the James R. Koehler Trust will be collectively referred to as the **Koehler Children's Trusts**.

- Defendant Kent Ries, the chapter 7 trustee of the bankruptcy estates of Catherine

---

[1] Joan Graham, another of the sisters, is not included here as she and her husband, Charlie Graham, were severed from this proceeding.  Her exclusion from any reference to the Koehler Family Members is not intended to necessarily mean that she was not a participant in any conduct or action attributable to the Koehler Family Members.

D. Koehler, Maurice and Mary Schooler, and Louise Trammell Conley, will be referred to as **Kent Ries**.

- Defendants Banjo, Inc., Burgess Trust #4, Carson Burgess, Inc., Carson Herring Burgess, Dennis Dougherty, Charlotte Burgess Griffiths, Heron Land Company, Herring Bank, Jessie Herring Johnson Estate Trust #1, Jessie Herring Johnson Estate Trust #2, Paul King, Matt Malouf, Cornelia J. Slemp Trust, Clay Storseth, Don Storseth, Individually and as Trustee of the Storseth Family Trust, Robert L. Templeton, Individually and as Executor of the Estate of Frances Maddox, deceased, Louise Johnson Thomas Trust, Vaudrey Capital, LP, and Marty Rowley, as Trustee of the Schooler/Conley Creditors Liquidation Trust will be referred to collectively as the **Templeton Group**.

- AHF Development, Ltd. will be referred to as **AHF Development**.

- Defendants Houston One Willow Park, Ltd., Houston Woodedge, Ltd., Houston Aston Brook, Ltd., Houston One Willow Chase, Ltd., and Conroe Stony Creek, Ltd. will be referred to collectively as the **AHF Intermediate Entities**.

## I. FINDINGS OF FACT

### AHF Bankruptcy

1.      On April 21, 2009, certain alleged creditors of the debtor, American Housing Foundation ("AHF" or the "Debtor"), filed an involuntary petition against the Debtor pursuant to chapter 11 of the Bankruptcy Code, thereby initiating an involuntary bankruptcy case [Case No. 09-20232] (the "Involuntary Case") against the Debtor.  On June 11, 2009, the Debtor filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code, initiating a voluntary case [Case No. 09-20373] (the "Voluntary Case").

2.      On July 17, 2009, the Court entered its *Agreed Order Granting Motion to Consolidate Bankruptcy Cases* [Docket No. 88; Case No. 09-20232], consolidating the Voluntary Case and the Involuntary Case into a single case (the "Bankruptcy Case") pursuant to Bankruptcy Rule 1015(a).

3.      On April 29, 2010, this Court entered the *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 1104; Case No. 09-20232].

4.    On December 8, 2010, this Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1918; Case No. 09-20232] (the "Confirmation Order"), confirming the *Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1909; Case No. 09-20232] (the "Plan").

**This Adversary Proceeding**

5.    On June 9, 2011, the Trustee filed the *Liquidating Trustee's Complaint to Avoid AHF Guaranty as Fraudulent Obligation, and to Avoid and Recover Fraudulent and Preferential Transfers, Together with Objections to Claims* (the "Complaint") [Docket No. 1, Adversary No. 11-02132],[2] thereby initiating this adversary proceeding against the defendants.

6.    Bank of America, Rainier[3], Joan Graham, and the Teresa Joan Koehler Graham Trust (the "Joan Graham Trust") are no longer parties to this adversary proceeding:

- On April 23, 2012, Bank of America, as Trustee of the James R. Koehler 1997 Trust, was dismissed as a party [Docket No. 105];

- On August 13, 2012, Rainier was dismissed as a party pursuant to the terms of a settlement agreement [Docket No. 152]; and

- On September 20, 2012, Joan Graham and the Joan Graham Trust causes of action were severed into Adversary Proceeding No. 12-02023 (Civil No. 2:12-CV-00222-C) [Docket No. 181].

7.    On February 15, 2013, the Trustee filed the *Fourth Amended Complaint* (the "Amended Complaint") [Docket No. 268] against the following defendants:

- Koehler Related Parties;

- Kent Ries;

---

[2] Additional docket references refer to Adversary No. 11-02132, unless otherwise noted.

[3] Rainier American Investors I, LLC, Rainier American Investors II, LLC, and Rainier American Investors III, LLC are collectively referred to as "Rainier."

- the Templeton Group;

- AHF Development; and

- AHF Intermediate Entities.

### Bifurcation of Adversary Proceeding

8.      On March 1, 2013, the Court entered its order [Docket No. 278] (the "March 1, 2013 Order") that provided that this adversary proceeding would be bifurcated into two trials. The first trial was to address all causes of action and disputed issues as between the Trustee, the Koehler Children's Trusts, the defendants that allegedly received transfers prior to the alleged transfers to the Koehler Children's Trusts, and any other necessary parties.  By the March 1, 2013 order, the named defendants for the first trial were designated as the following: Maurice Schooler, Custodian for August Wendt; Maurice Schooler, Custodian for Erin Wendt; Maurice Schooler, Custodian for Koehler Wendt; Mary C. Schooler, Trustee of the Mary C. Schooler Trust; Mary Catherine Schooler Trust; Louise Trammell Conley, Trustee of the Louise Trammell Conley Trust; Schooler Properties, Ltd.; JRK-CDK, Ltd.; LKC-CDK, Ltd.; MKS-CDK, Ltd.; LKC-TC, Ltd.; Cristi Cocke Trammell; Catherine Suzanne Schooler; Kent Ries, Chapter 7 Trustee for the Estates of Catherine D. Koehler, Maurice Schooler, Mary C. Schooler, and Louise Trammell Conley; Marty Rowley, as Trustee of the Schooler/Conley Creditors Liquidation Trust; AHF Development, Ltd.; Houston One Willow Park, Ltd.; Houston Woodedge, Ltd.; Houston Aston Brook, Ltd.; Houston One Willow Chase, Ltd.; and Conroe Stony Creek, Ltd.  The order provided that the balance of the defendants[4] could participate in the first trial but the claims against them would not be taken up at the first trial.  Such claims would be addressed by a second trial.

---

[4] The balance of the defendants are as follows:  Banjo, Inc.; Burgess Trust #4; Carson Burgess, Inc.; Carson Herring Burgess; Dennis Dougherty; Charlotte Burgess Griffiths; Heron Land Company; Herring Bank; Jessie Herring Johnson Estate Trust #1; Jessie Herring Johnson Estate Trust #2; Paul King; Matt Malouf; Cornelia J. Slemp Trust; Clay Storseth; Don Storseth, Individually; Don Storseth, Trustee of the Storseth Family Trust; Robert L. Templeton,

**Background Facts**

9.      Raymond and Catherine D. Koehler were married and had six children: Mary Catherine Schooler (husband Maurice Schooler), Louise Trammell Conley, Joan Graham (husband Charles Graham), James R. Koehler (deceased 5/8/07), William R. Koehler, and John Michael Koehler.

10.     Raymond Koehler died on March 15, 1986. *See* Defendants' Ex. 116. His Last Will and Testament (the "Will"), dated April 18, 1981, provided for the creation of six trusts—the William R. Koehler Trust, the Mary Catherine Schooler Trust, the James R. Koehler Trust, the Louise Trammell Trust, the John M. Koehler Trust, and the Teresa Joan Koehler Graham Trust (defined here collectively as the Koehler Children's Trusts)—to which the bulk of his estate assets would pass upon his death. *See* Trustee's Ex. 111. The Will states that his primary concern in establishing the trusts was to "provide for the support and maintenance of my wife during her life in the standard of living to which she is accustomed to at the time of my death." *Id.* The trustees were to distribute to his wife, Catherine, "such amounts of the Trusts Estate of such trust as shall be necessary to so maintain her." *Id.* The balance of the trust assets then pass to the beneficiaries named under the named trusts which, with the exception of the William R. Koehler Trust, is the child for which the trust is named. For the William R. Koehler Trust, the beneficiaries were the children of William R. Koehler. The Will generally provides that the trusts terminate five years after the date of the death of his wife, Catherine. On March 14, 1986, one day prior to his death, Raymond Koehler executed a codicil to his Will that changed the terms of his Will concerning the provisions for the use of the estate assets for the support of his wife Catherine Koehler. *Id.* The codicil states that the bulk of the estate assets pass to his "Trustees in

Individually; Robert L. Templeton, Executor of the Estate of Frances Maddox; Louise Johnson Thomas Trust; and Vaudrey Capital, LP.

trust during the life of my wife" for her support. It specifically provides that she shall be paid "at any time and from time to time such sums from or such part of the principal of the Trust, including the whole thereof, as my Trustees may, in their sole discretion, determine to be necessary or desirable to permit her to maintain her usual standard of living, including payment of the costs of any illness or accident which may affect her." *Id.*

11.     The parties here submit that a seventh trust, the Catherine D. Koehler Trust, was created by the codicil to the Will. They further submit that the bulk of Raymond Koehler's estate assets passed to the Catherine D. Koehler Trust with the beneficiaries the same as those identified as beneficiaries under the six trusts under the Will. The beneficiaries were not to receive their respective shares until five years after Catherine Koehler's death.

12.     Certain of the six children now own interests in numerous entities and have children of their own.

### The 2006 "Gifts" to AHF

13.     In 2005, the Koehler Family Members, particularly Catherine Koehler and the daughters, determined that they wanted to bypass the trust provision in the Catherine Koehler Trust that provided that the assets held in such trust, consisting of stocks and other securities, would not pass to the children until five years after her death. Catherine Koehler was then in her mid-nineties.

14.     By 2006, they had another issue concerning their inheritance that they wanted to address. They had inherited significant Bank of America corporation stock from their father that had a low tax basis and thus a substantial built-in taxable gain when sold. They wanted to sell the stock and use the proceeds to diversify their holdings but, in doing so, wanted to avoid the taxes realized from the sale.

15.     The Koehler Family Members sought Sterquell's advice regarding their desires, and he devised a scheme to accommodate their goals.

16.     Sterquell's scheme involved the use of the various family trusts and family-owned entities in the making of ostensible gifts to AHF.

17.     The Koehler Family Members previously created and owned the following limited partnerships: Schooler Properties, Ltd.; LKC-TC, Ltd.; LKC-CDK, Ltd.; MKS-CDK, Ltd.; JKG-CDK, Ltd.; and JRK-CDK, Ltd. (the "Limited Partnerships"). For each of the Limited Partnerships, yet another entity, a family owned corporation, served as the general partner and one of the children and/or Catherine Koehler served as limited partner(s). Of note, neither William Koehler nor Mike Koehler, two of the sons of Raymond and Catherine Koehler, held an interest in any of the Limited Partnerships.

18.     In May 2000, the Koehler Family Joint Venture, a general partnership, was created among the Limited Partnerships. *See* Defendants' Ex. 68. Each Limited Partnership was a 16.67% owner in the Koehler Family Joint Venture. *Id.* Each of the Limited Partnerships, as partners of the Koehler Family Joint Venture, contributed 15,000 shares of Bank of America stock ("BOA Stock") to the partnership at a stated cost of $21,600 each. *Id.* The purpose of the partnership was to own and manage 52,294.500 shares of the 1999 Goldman Sachs Exchange Fund. *Id.*

19.     The Koehler Family Joint Venture made a "gift" of 52,294.500 shares of Goldman Sachs Exchange Fund to AHF by the "Gift Assignment of Shares" dated September 15, 2006. *See* Trustee's Ex. 202. The value of the shares, originating from the BOA Stock, was

$5,819,261.57. *Id.* The Koehler Family Joint Venture reported the transfer as a charitable contribution on its 2006 federal income tax return. *See* Trustee's Ex. 204.[5]

20.     In addition, the Catherine Koehler Trust executed a Gift Assignment of Assets in 2006, dated September 15, 2006, in which it gifted $4.880 million of assets from the trust to AHF (*see* Trustee's Ex. 223), and reported that transfer as a charitable contribution to the IRS on its 2006 federal income tax return (*see* Trustee's Ex. 224).

21.     AHF sold the BOA Stock and, as an asserted § 501(c)(3) corporation, avoided paying tax on the gain realized from the sale.

22.     The 2006 gifts were preceded by a series of five meetings that the Koehler family had with Sterquell.   The purpose of the meetings was principally to determine how to, in effect, break the trust provisions established by the Will and codicil.

23.     William Koehler was not included in any of the meetings; he and his children were estranged from the rest of the family.

24.     After Raymond Koehler's death in 1986, Mike Koehler assisted his mother with her finances.  He did this until about 1995 or 1996; around this same time, Catherine Koehler stopped using her CPA who was out of Dalhart, Texas.  She then started using Sterquell as both an accountant and financial advisor.

### The 2007 "Repayments" of the 2006 "Gifts"

25.     AHF "repaid" the 2006 "gifts," but not to either the Catherine Koehler Trust or the Koehler Family Joint Venture, but rather to the Koehler Children's Trusts (thereby "breaking the trust" and avoiding the five-year condition of the Catherine Koehler Trust).

---

[5] The Koehler Family Joint Venture issued Schedules K-1 allocating the contribution deduction to each of the Limited Partnerships owned by Catherine D. Koehler and the four children.  Those partnerships issued Schedules K-1 to Catherine D. Koehler and the four children, and they claimed the charitable contribution deductions on their individual income tax returns. *See* Trustee's Exs. 205–222.

26.     The 2006 gifts were repaid through the following scheme: [6]

- On April 4, 2007, AHF formed three wholly-owned subsidiaries: AHF-RCL I, LLC, AHF-RCL II, LLC, AHF-RCL III, LLC (collectively, the "RCL Entities"). The RCL Entities had no employees, no business operations, and no assets.

- Rainier[7] loaned the RCL Entities approximately $14.4 million pursuant to the April 17, 2007 loan agreements. The RCL Entities transferred all of those funds to the AHF Controlled Accounts.[8] AHF then transferred the following amounts to the following Koehler Children's Trusts from the AHF Controlled Accounts in exchange for a worthless 99% limited partnership interest in GOZ No. 2, Ltd. *See* Trustee's Exs. 303–304.

| Ostensible Seller: | Amount Received: |
|---|---|
| Mary C. Schooler Trust | $3,793,430 |
| Louise Trammell Trust | $2,712,500 |
| Joan Graham Trust | $3,161,788 |
|  | $9,667,718 |

- AHF and AHF Development transferred funds into the accounts of the AHF Intermediate Entities and, on the same day, caused the AHF Intermediate Entities to transfer funds to the above identified three Koehler Children's Trusts.

27.     Alan Weiner, the Trustee's expert, credibly testified regarding the flow of funds that began with the $14.4 million loan made by Rainier in April 2007. The loan funds were disbursed to the RCL Entities. The RCL Entities had no employees and no operations and thus no source of income. AHF guaranteed the Rainier loan. According to Weiner, within a few days after the loan disbursement, $10.921 million of the funds passed from the RCL Entities to AHF Development; $2.623 million from the RCL Entities to the AHF Intermediate Entities; and

---

[6] For additional evidence of the scheme, see (a) the e-mail correspondence in Trustee's Exs. 328–329, (b) Trustee's Exs. 1800–1809, and (c) Alan Weiner's Expert Report (Trustee's Exs. 1602).

[7] *See supra* note 3.

[8] AHF Controlled Accounts include bank accounts in the name of AHF, AHF Development, and the AHF Intermediate Entities, all of which were controlled by AHF and its employees.

$853,000 from the RCL Entities to AHF.  In addition, $2.353 million passed from AHF to the AHF Intermediate Entities, and $4.9 million passed from AHF Development to the AHF Intermediate Entities.  Finally, again within the same immediate timeframe, the AHF Intermediate Entities conveyed $8.195 million and the RCL Entities conveyed $1.472 million—for a total of $9.667 million—to the Joan Graham Trust ($3,161,788), the Louise Trammell Trust ($2,712,500), and the Mary Schooler Trust ($3,793,430).[9]

28.     These transfers of funds, at all levels, were handled by and effected by AHF employees and at the direction of Sterquell.  The bank accounts through which the funds flowed were under the dominion and control of AHF, through Sterquell.

29.     The funds transferred to the Koehler Children's Trusts from AHF, AHF Development, and the AHF Intermediate Entities accounts constitute property in which AHF possessed an interest.

30.     As stated, the "repayments" were made to the Koehler Children's Trusts—the Mary Schooler Trust, the Louise Trammell Trust, the Joan Graham Trust, and the James R. Koehler Trust.  However, each of the trusts ostensibly conveyed their respective interests in an entity named GOZ No. 2, Ltd. *in consideration for* the "repayment."

### The 2008 "Gifts" to AHF

31.     Apparently satisfied that the 2006 transfers were successful (the Koehlers successfully avoided tax on the sale of BOA Stock, obtained gift tax deductions, and bypassed the five-year condition of the Catherine Koehler Trust by directing funds to the Koehler Children's Trusts), the Koehler Family Members decided to enter into more transactions with AHF in 2008.

---

[9] An additional $1,084,734.25 was transferred to the James R. Koehler Trust, but Bank of America, as trustee, returned the funds because the check was made payable to the James R. Koehler Trust when it should have been made payable to JRK-CDK, Ltd.  *See* Trustee's Ex. 1003.

32.     In 2008, the Koehler Family Members were particularly concerned about the Bank of America stock that they still held in trust and its rapidly decreasing value as a result of the downturn of the financial markets in 2008. They wanted to liquidate the stock but do so in a manner that minimized or avoided taxes on the gain realized. They, therefore, as they had done in 2006, effected a gift of the stock to AHF, but did so principally through the Limited Partnership entities (and not through the Koehler Family Joint Venture as they did in 2006). The funds realized after the sale by AHF as a non-profit were then to somehow "come back" to the family devoid of adverse tax consequences. Their plan was to then use the tax-free funds to diversify their portfolio of investments.

33.     In 2008, the Koehler Related Parties, principally by and through the Limited Partnerships, executed Gift Assignments of Stock, gifting $4.510 million of additional BOA Stock to AHF (again to obtain charitable tax deductions and to allow AHF to sell the stock and avoid tax on the gain). *See* Trustee's Exs. 401, 503, 605, 705, 804, 905, 1005, 1105, and 1204.

34.     The Koehler Related Parties also had executed Gift Assignments of Assets gifting $4.693 million of cash and bonds to AHF in 2008. *See, e.g.*, the proofs of claims of LKC-TC,Ltd., Louise Trammel Trust, and Mary Schooler Trust (Trustee's Exs. 903, 1104, and 1203).

**Sterquell's Death, the AHF Bankruptcy, and Koehler Claims**

35.     Sterquell died in early April 2009, reportedly by suicide, and AHF was placed into bankruptcy shortly thereafter. AHF had not, at the time of the bankruptcy filing, returned (or "repaid") the 2008 "gifts."

36.     In July 2009, the Koehler Related Parties filed, under penalty of perjury, the following proofs of claims in the aggregate amount of $10,967,359, asserting that the 2008 transfers to AHF *were not gifts* but rather "investments" in AHF that AHF promised to repay:[10]

| Claimant | Claim Number[11] | Amount |
|---|---|---|
| Louise Trammell (Conley) Trust | 20 AHF-V | $3,007,647 |
| Mary Catherine Schooler Trust | 12 AHF-V | $2,875,593 |
| LKC-TC, Ltd. | 19 AHF-V | $2,167,599 |
| JRK-CDK, Ltd. | 105 AHF-I | $927,907 |
| Schooler Properties, Ltd. | 16 AHF-V | $891,736 |
| MKS-CDK, Ltd. | 11 AHF-V | $230,144 |
| Catherine Suzanne Schooler | 25 AHF-V | $64,656 |
| Maurice Schooler, Custodian for August Wendt | 13 AHF-V | $59,622 |
| Maurice Schooler, Custodian for Erin Wendt | 14 AHF-V | $59,622 |
| Maurice Schooler, Custodian Koehler Wendt | 15 AHF-V | $59,622 |
| Catherine D. Koehler | 7 AHF-V | $192,278 |
| LKC-CDK, Ltd. | 10 AHF-V | $204,736 |
| Cristi Cocke Trammell (withdrawn) | 18 AHF-V | $226,195 |
| **TOTAL** | | **$10,967,359** |

37.     A few weeks later, the Koehler Related Parties filed their 2008 tax returns representing to the IRS that the 2008 transfers *were gifts* to AHF, and charitable contribution deductions were taken for the gifts. *See* Trustee's Exs. 402, 504–507, 606–609, 706–711, 805, 906–908, 1006–1008, 1106, and 1205.

---

[10] *See* Trustee's Exs. 404–405, 508–509, 602–603, 702–703, 802–803, 902–903, 1002–1003, 1102–1104, and 1202–1203.

[11] AHF-I is for a claim filed in the involuntary bankruptcy proceeding (Case No. 09-20232) and AHF-V for the voluntary proceeding (Case No. 09-20373).

38.     In addition to the gift transfers of approximately $10 million made by the Koehler Family Members in each of 2006 and 2008 and the multi-layered transactions through the various trusts and entities, certain of the Koehler Related Parties issued guaranties *of* AHF debt to other parties.  As a result of the guaranties, the Koehler Family Members have paid over $6.2 million to third parties in settlement of the guaranties.  *See* Defendants' Ex. 168.[12]

### Assignment of Claims to Ries/Rowley

39.     Certain Koehler Related Parties owned interests in AHF affiliates and, accordingly, were sued in state court by Templeton and other investors.  On or about September 25, 2009 (after filing the claims listed above in July 2009), the following four individuals filed chapter 7 bankruptcy cases with this Court: Catherine D. Koehler (the mother); Mary Catherine Schooler (daughter) and her husband Maurice Schooler; and Louise Trammell Conley (daughter) (collectively, the "Koehler Related Ch. 7 Debtors").

40.     Kent Ries was appointed chapter 7 trustee for the bankruptcy estates of these four Koehler Related Ch. 7 Debtors, and therefore controls all AHF claims filed by these four debtors in the AHF bankruptcy case.

41.     On their respective bankruptcy filing dates, the Koehler Related Ch. 7 Debtors owned interests in numerous non-debtor entities; *see* Findings 17 and 18.

42.     Kent Ries, Catherine D. Koehler, Mary Schooler, and Louise Conley settled disputes among them concerning whether Ries, as Trustee, had authority to reach into the non-debtor entities, sell their assets, and recover the sale proceeds for the benefit of the bankruptcy estates.  As part of the settlements, Ries was assigned the following claims of non-debtor Koehler Related Parties against AHF:[13]

---

[12] The Court refers to Defendants' Ex. 154 for a list of the guaranties.
[13] *See* Trustee's Ex. 102, 406, 510, 604, 704, 904, and 1004.

| | Claim No.[14] | Amount |
|---|---|---|
| Catherine Koehler | 7 AHF-V | $192,278 |
| Schooler Properties, Ltd. | 16 AHF-V | 891,736 |
| LKC-TC, Ltd. | 19 AHF-V | 2,167,599 |
| JRK-CDK, Ltd.[15] (62%) | 105 AHF-I | 575,302 |
| MKS-CDK, Ltd. | 11 AHF-V | 230,144 |
| LKC-CDK, Ltd. | 10 AHF-V | 204,736 |
| | | $4,261,822 |

43.     Kent Ries then contracted to pay certain of the transferors 20% of his net

recovery, if any, on the claims in exchange for their cooperation in prosecuting the claims.

44.     Each settlement document expressly states as follows:

> "[T]here are documents reflecting that this transfer was a gift to
> AHF, but the claimant claims that the transfer was a loan or
> investment and that it was supposed to be repaid . . . ."

45.     Members of the Templeton Group sued the Schooler Trust (not subject of a

bankruptcy proceeding) in state court, asserting that the Schooler Trust was liable as guarantor of

the AHF indebtedness allegedly owed to them.  On April 23, 2010, the Templeton Group and the

Schooler Trust entered into a settlement agreement pursuant to which Marty Rowley, Trustee of a

creditors trust established for the benefit of the Templeton Group and a few other creditors,

received, among other things:

- Approximately $2.1 million of assets, and

- An assignment of the Schooler Trust claim (Claim No. 12, Case No. 09-20373) against AHF in the amount of $2,875,593.

46.     Members of the Templeton Group also sued the Louise Trammell Trust (not

subject of a bankruptcy proceeding), asserting the Louise Trammell Trust was also liable as

---

[14]  AHF-I for a claim filed in the involuntary bankruptcy proceeding (Case No. 09-20232) and AHF-V for the voluntary proceeding (Case No. 09-20373).

[15]  All assignments were for 100% of the claims, other than JRK-CDK, Ltd. which appears to assign 62%  of the $927,907 claim to Ries.

guarantor of AHF indebtedness.  On November 8, 2010, the Templeton Group and the Louise Trammell Trust entered into a settlement agreement by which Marty Rowley, Trustee of the Creditors Trust established for the benefit of the Templeton Group and a few other creditors, received, among other things:

- Approximately $1.4 million; and

- An assignment of the Louise Trammell Trust claim (Claim No. 20, Case No. 09-20373) against AHF, in the amount of $3,007,648.

47.     Accordingly, Marty Rowley, as Trustee, is now the owner and holder of the following Koehler Related Parties' claims: the Mary Schooler Trust claim (Claim No. 12, Case No. 09-20373) in the amount of $2,875,593, and the Louise Trammell Trust claim (Claim No. 20, Case No. 09-20373) in the amount of $3,007,647.

### The AHF Intermediate Entities

48.     Houston One Willow Chase, Ltd. ("Willow Chase") was a Texas limited partnership formed on May 21, 2007, with MC-CDC One Willow Chase, Inc. ("MC-CDC Willow Chase") serving as the corporate general partner.  On October 24, 2006, an application was made to the Texas Secretary of State to reserve MC-CDC Willow Chase's name, but such entity was never formed.  On January 2, 2009, a Certificate of Termination of a Domestic Entity was filed with the Texas Secretary of State which terminated Willow Chase as an entity.  According to Larry Bunn, the stated president of the general partner, Willow Chase and MC-CDC Willow Chase never owned any assets, never had any employees, and never conducted any business operations.  He did not set-up or have control of a bank account for Willow Chase.  *See* Trustee's Ex. 324.

49.     Houston One Willow Park, Ltd. ("Willow Park") was a Texas limited partnership formed on May 21, 2007, with MC-CDC One Willow Park, Inc. ("MC-CDC Willow Park")

serving as the corporate general partner. On October 24, 2006, an application was made to the Texas Secretary of State to reserve MC-CDC Willow Park's name, but such entity was never formed. On January 2, 2009, a Certificate of Termination of a Domestic Entity was filed with the Texas Secretary of State which terminated Willow Park as an entity. According to Larry Bunn, the stated president of the general partner, Willow Park and MC-CDC Willow Park never owned any assets, never had any employees, and never conducted any business operations. He did not set-up or have control of a bank account for Willow Park. *See id*.

50.     Houston Aston Brook, Ltd. ("Aston Brook") was a Texas limited partnership formed on May 21, 2007, with MC-CDC Aston Brook, Inc. ("MC-CDC Aston Brook") serving as the corporate general partner. MC-CDC Aston Brook was formed on May 22, 2007, and MC-CDC Aston Brook changed its name on December 13, 2007 to "MC-CDC Austin GP, Inc." Also on December 13, 2007, Aston Brook filed a Certificate of Amendment with the Texas Secretary of State to change its name to "MC-CDC Austin, Ltd." On January 2, 2009, a Certificate of Termination of a Domestic Entity was filed with the Texas Secretary of State which terminated MC-CDC Austin, Ltd. f/k/a Aston Brook as an entity. On May 12, 2009, a Certificate of Termination of a Domestic Entity was filed terminating MC-CDC Austin GP, Inc. f/k/a MC-CDC Aston Brook. According to Larry Bunn, the stated president of the general partner, Aston Brook and MC-CDC Aston Brook never owned any assets, never had any employees, and never conducted any business operations. He did not set-up or have control of a bank account for Aston Brook. However, an account was set up for MC-CDC Aston Brook around May of 2007, but it had no activity other than client service charges which were later credited back to the account. *See id*.

51. Houston Woodedge, Ltd. ("Woodedge") was a Texas limited partnership formed on May 21, 2007, with MC-CDC Woodedge, Inc. ("MC-CDC Woodedge") serving as the corporate general partner. MC-CDC Woodedge was formed on May 22, 2007, and MC-CDC Woodedge changed its name on December 13, 2007 to "MC-CDC Amarillo GP, Inc." Also on December 13, 2007, Woodedge filed a Certificate of Amendment with the Texas Secretary of State to change its name to "MC-CDC Amarillo, Ltd." On January 2, 2009, a Certificate of Termination of a Domestic Entity was filed with the Texas Secretary of State which terminated MC-CDC Amarillo, Ltd. f/k/a Woodedge as an entity. On May 12, 2009, a Certificate of Termination of a Domestic Entity was filed terminating MC-CDC Amarillo GP, Inc. f/k/a MC-CDC Woodedge. According to Larry Bunn, the stated president of the general partner, Woodedge and MC-CDC Woodedge never owned any assets, never had any employees, and never conducted any business operations. He did not set-up or have control of a bank account for Woodedge. *See id*.

52. Larry Bunn testified that the partnerships were originally created for the purpose of purchasing properties that could potentially qualify for low-income housing tax credits. The applications for tax credits were denied, however, and the partnerships never had any operations or assets. He did not dispute the Trustee's assertion that any funds that may have passed through an account that was labeled by the name of any of the partnerships were funds of AHF.

### Testimony of Catherine Koehler

53. Catherine Koehler's testimony was submitted to the Court by video deposition. She described how her husband Raymond rose from janitor at the Citizens State Bank of Dalhart when he was first hired in the 1930s to president and principal owner of the bank.

54.     Concerning the transfers to AHF in 2006, Catherine Koehler testified that Sterquell explained to her that they would be partners in a partnership and that, as a result, the investments would generate significant tax savings.  She emphasized that she expected to get her money back.  When asked to explain why she signed gift assignments to effect the transfers, she simply stated that they were not gifts.  She said she asked Sterquell if he had sufficient life insurance to cover the transfers because, as she explained it, they were investments.  Despite this, at other parts of her testimony, she said the transfers had to be loans because the transfers were to be returned.  As she poignantly explained, she and her daughters lost everything after Sterquell committed suicide.  She filed bankruptcy as a result, at the age of 97.

**Testimony of Joan Graham**

55.     Joan Graham testified that despite the clear wording of the gift assignments, it was not her intent to make a true gift to AHF.  She said the funds (and/or securities) were to "come back" within thirty days.  When the funds were not returned by the end of the year in 2006, she was very upset and told other family members that she may retain a lawyer to assist her in recovering the funds.

56.     Though Joan Graham testified that she knew nothing about GOZ No. 2, Ltd., she was aware that GOZ No. 2, Ltd. shares were somehow used in the repayment of the 2006 transfers.

**Testimony of Charlie Graham**

57.     Charlie Graham, Joan Graham's husband, testified about certain somewhat peculiar incidents that he says occurred in the time frame of 1977 to 1981, all of which he contends caused him and his wife to distrust Sterquell.  Charlie Graham's recollection of unusual

events that occurred almost thirty years prior to the transactions here are not relevant to the causes of action here.

### Testimony of Trey Trammell

58.     Trey Trammell is the son of Louise Trammell Conley and is a licensed stock broker.  He testified that the "gift" concept that was part of Sterquell's plan did not make sense and that he relayed his concerns regarding Sterquell's proposed scheme to his mother.  He did not trust Sterquell and was concerned that the deals were illegitimate.  He said that *gifts* to a non-profit entity that were to be paid back was nonsensical.  He also understood that the combination of large returns (12% on the gifts) with significant tax benefits (i.e., tax avoidance) likewise did not make sense.  He told his mother that the deal was too good to be true.  He shared his concerns more generally with Mary and Maurice Schooler, as well.

### Testimony of Louise Conley

59.     Louise Conley testified that the 2006 transfers were made for the purpose of "breaking the trust."  She said the 2006 transfers were not ever intended to be gifts; they were, according to her, investments, albeit investments without question as to liability on Sterquell's or AHF's part.  She further testified that the transferred assets were to be returned within 30 to 90 days.  The "repayments" were made to benefit Mary, Louise, Joan, and James; William and Michael were intentionally left out as part of the plan.

60.     Louise Conley admitted that Trey Trammell had urged her not to participate in Sterquell's plan.

61.     Louise Conley had no knowledge of any interest in GOZ No. 2, Ltd., though she thought perhaps her trust, the Louise Trammell Trust, was a partner in GOZ No. 2, Ltd.  She admitted the deals were very confusing.  Neither Mary, Louise, nor Joan had any recollection or

knowledge of ever acquiring an interest in GOZ No. 2, Ltd. and could not identify any basis for any value in such entity.

62. The Koehler Children's Trusts ostensibly served as limited partners of AHF Development. Louise Conley testified that she knew nothing about AHF Development, however.

63. The proof of claim of the Louise Trammell Trust, as amended on December 10, 2009, asserts a claim amount of $3,007,647.99; the claim basis is "Investment." The proof reflects "transferred investments" in 2008 in the amount of the claim. Attached to the claim is a guaranty dated January 12, 2008, signed by Sterquell on behalf of AHF. The guaranty states that the "Principal" is LIHTC Walden II Development, Ltd.; that the Louise Conley Trust is the investor; that the investment amount is $1,170,036.99; and that the guaranty covers the "[r]eturn of [i]nvestment within twelve . . . months of investment, plus a preferential return of eighteen percent . . . per annum until such amount is paid in full." Trustee's Ex. 1104. Louise Conley testified that she could not remember making such investment, and she provided no proof that she did.

64. The 2008 tax return for the Louise Trammell Trust was signed on September 11, 2009, and presumably then filed. It reflects a charitable donation of $764,403. Louise Conley admitted that the trust never made a charitable donation in such amount.

### Testimony of Mary Schooler and Maurice Schooler

65. Mary Schooler testified that her mother, in 2005, specifically wanted to get the estate assets to the children. She also testified that she and her family knew that Joan and Charlie Graham did not trust Sterquell.

66. Mary was aware that Trey Trammell distrusted Sterquell. She and Maurice trusted Sterquell implicitly, however.

67.     Sterquell, Hill & Goelzer, LLP prepared a Statement of Financial Condition for the Schoolers, which was dated March 30, 2007, to reflect their financial condition as of December 31, 2006.  The statement provides that they had a net worth of over $11.8 million.  Their largest asset was their interest in the Mary Schooler Trust, having a value of over $6.5 million.  The trust in turn had as its largest asset an interest in GOZ No. 2, Ltd. valued at $3.735 million.  *See* Defendants' Ex. 85.  Mary Schooler said she had no knowledge of GOZ No. 2, Ltd. and could provide no evidence to support the attributed value.

68.     Mary Schooler testified that the 2006 gift transfers were to come back within a "reasonable period of time."

69.     Mary Schooler knew that her brother Mike, who was sophisticated with finances, did not understand Sterquell's explanation of the 2006 plan.

70.     Mike Koehler had worked with his dad in the bank for seventeen years.  He ultimately became part owner of the bank and thus had his own, separate ownership of the Bank of America stock that arose upon acquisition of the bank.  According to Mary Schooler, Mike did not receive any of the Raymond Koehler estate assets as a result of the 2006 transactions because he "didn't need it."

71.     Maurice Schooler testified that the transactions constituted an investment in AHF; he understood that by an investment one hopes to make a profit as a result of the investment.

**Testimony of Chip Glispin**

72.     Chip Glispin served as an investment manager for the Koehler Family Members beginning in 2006.

73.     Much of the inherited wealth from Raymond Koehler consisted of Bank of America stock that he owned as a result of his successful banking career.  Catherine Koehler and

the Koehler Family Members wanted to effect a strategy through which they could liquidate the stock and minimize or avoid the taxes realized upon the sale of the stock.  Glispin was advised of this goal.  He admitted that any strategy that contemplated investments as gifts and returning of the corpus of the investment with a 12 to 18% interest factor and with no tax implications was suspect.

74.     Glispin testified that Mary and Maurice Schooler totally trusted Sterquell and were adamant about following Sterquell's advice.

75.     Glispin credibly testified that the Koehler Family Members did not understand the details of Sterquell's plan but did understand the "global" concepts.

76.     Glispin attempted to recharacterize the nature of the deals as "assignments" of the assets to AHF with the "expectation" that the assets would be returned within 60 to 90 days.  He further testified that there was no defined maturity date for the return of the assets and no defined rate of return.

77.     Glispin testified that, in his opinion, the Koehler Family Members had no intention of involving themselves in a fraudulent tax scheme and that they believed the deals in both 2006 and 2008 were legitimate.  He admitted, however, that his opinion did not take into account any warnings the family may have received from Trey Trammel; he claimed that he had no specific knowledge of the specific tax strategy involved or of the use of interests in GOZ No. 2, Ltd. in the transactions.  He had not seen or reviewed any K-1s or tax returns or any documents concerning the GOZ No. 2, Ltd. interests.

**Testimony of Mike Ohm**

78.     Mike Ohm, a CPA in Amarillo, Texas, was retained by the Koehler Family Members to prepare tax returns for their various entities.  He was retained upon the

recommendation of their attorneys, Nancy Stone and Brad Korell, in May or June 2009, after Sterquell's death, for purposes of preparing the 2008 tax returns. He worked mostly with Korell. He prepared twelve separate returns for the various Koehler Related Parties; they reflected over $10 million in charitable contributions to AHF for 2008. Ohm admitted that the charitable contributions, to be valid, had to arise from true gifts. In preparing the returns, he relied upon documents provided to him and representations made to him by Korell and Jeremy Goelzer, Sterquell's accounting firm partner. In preparing the returns, Ohm reviewed the 2007 tax returns; he was also aware of Sterquell's suicide and the Koehler family's claims against Sterquell's estate for the $10+ million in investments made in 2008.

79. Ohm testified that he was never told by any of the Koehler Family Members or their attorneys, Stone and Korell, that the 2008 transfers, labeled as gifts, were not actual gifts. The returns were filed in October 2009, by which time the AHF bankruptcy had already been filed. In July 2009, three months prior to the filing of the tax returns, the Koehler Related Parties filed their proofs of claim in the bankruptcy case asserting that the transfers were "investments" that created unsecured claims against AHF. *See, e.g.*, Trustee's Exs. 507, 508.

80. Ohm prepared and filed returns for the following Koehler Related Parties: Louise Trammell (Conley) Trust; the Mary C. Schooler Trust; LKC-TC, Ltd.; JRK-CDK, Ltd.; Schooler Properties, Ltd.; NKS-CDK, Ltd.; Catherine Suzanne Schooler; Maurice Schooler, custodian for Augustine Wendt; Maurice Schooler, custodian for Erin Wendt; Maurice Schooler, custodian for Koehler Wendt; Catherine D. Koehler; LKC-CDK, Ltd.

### Testimony of Ginger Nelson

81. Ginger Nelson, an attorney in Amarillo, Texas, who is board certified in estate planning and probate law, was contacted in June 2008 by Jeremy Goelzer to, as she called it,

"paper" the estate plan that Sterquell had devised for the Koehler family. She testified that she understood that the goal was to make contributions from the trusts and thus realize "tax discounts" but, "in the end," the investment was to come back. She characterized the transactions as complex and said she understood that they had passed IRS audits in prior years. She did not question the deals or attempt to substantively analyze the transactions as "papered."

### Testimony of Pam McDonald

82.     Pam McDonald was a former senior vice president of AHF. She started with AHF in 1991 and served as treasurer and controller. She described the Koehler Family Members as "seed investors" at a time when AHF needed capital for its low-income housing projects. She acknowledged that they made their investments as gifts and were to receive tax benefits along with return of the so-called gifts. She said she had no understanding of this, however. She disavowed any knowledge of the purported tax benefits of GOZ No. 2, Ltd. or of the specifics discussed at the 2006 meetings that preceded the transfers.

### Testimony of Jeremy Goelzer

83.     Jeremy Goelzer, Sterquell's former partner in their accounting firm, was present at some of the meetings between Sterquell and the Koehler family. He described the 2006 and 2008 transfers to AHF as investments with the expectation on the family's part that they would realize a gain. He said the Koehler Family assumed they would get their investments back. He testified that the emphasis for the 2008 transaction was the transfer of the Bank of America stock and thus the avoidance of taxes. He said Sterquell assured the family that the financial condition of AHF was good and that, in addition, he (Sterquell) had substantial life insurance "if something happened." Goelzer believed the transfers were investments and admitted that charitable donation deductions do not arise from investments.

**Testimony of Mike Koehler**

84.     Mike Koehler did not participate in the family's efforts to break the trust or

participate otherwise in the 2006 or 2008 transactions.  He knew he was cut-out by virtue of the

2006 transactions and when asked if he was upset about it, he said, "yes and no."

**Additional and Concluding Facts**

85.     Well after Sterquell's death and after the Koehler Family Members understood

that there was a serious problem in recovering their 2008 investments, they filed their claims with

the Court and then filed tax returns claiming charitable donation deductions from the same

"investments."  Both the proofs of claim and the tax returns were prepared and filed with the

advice of counsel and accountants that had no connection with Sterquell or AHF.

86.     In March 2009, Catherine Koehler obtained a legal opinion addressing her

authority to make a gift of all the trust assets to AHF, and executed an affidavit (the "Koehler

Affidavit") swearing that it was her intent to make a gift of the trust assets to AHF (*see* Trustee's

Ex. 229).

87.     Though the proofs of claim as originally filed by the Koehler Related Parties state

that the basis for each of the claims made was an "investment," certain of the claims were

amended with the amendments stating that the claims arose from "unreturned monies owed," or

amounts owing upon "transferred investments."  The Koehler Related Parties clearly struggled

with how to characterize their claims.  They did not file claims based on tort theories of recovery.

88.     The Koehler Family Members understood that they were investing in Sterquell's

enterprise but doing so by gift instruments, with the expectation that the funds would somehow

come back with a significant return and with significant tax benefits.  By then, given that they had

basically been paid back on the 2006 transfers, they apparently took for granted that the 2008 "gifts" would likewise effectively bypass the five-year trust condition.

89.     The testimony of the defendants' expert, Eric Nemeth, is flawed.  Nemeth opined that the Koehler Related Parties were not engaged in an abusive tax scheme because the transactions here did have economic substance.  Such substance, according to Nemeth, arose from the taxpayers', the Koehlers', bankruptcies and the fact that they lost their investments.  This analysis ignores the most egregious fact: that the Koehler Related Parties filed tax returns claiming charitable donation deductions on bogus gifts.  He also testified that the tax savings were minimal—a no harm, no foul kind of rationale.  He admitted, however, that this conclusion failed to account for the intentional avoidance of any capital gains taxes by washing the Bank of America stock through AHF.  It also does not account for the failure to account for *any* taxes potentially owed on receipt of the 2007 "repayments."  Of note, the repayments make no legal sense as they are both "repayments" and "gifts" and "payments" for worthless GOZ No. 2, Ltd. interests.

## II.
## CONCLUSIONS OF LAW

1.     The Court has jurisdiction over this complaint and the causes of action asserted herein under 28 U.S.C. §§ 157(a) and (b) and 1334.

2.     The causes of action asserted herein are core proceedings under 28 U.S.C. § 157(b).

3.     Venue of this action is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     This Court has the power and is authorized to provide the requested relief pursuant to §§ 105, 502(d), 510(b), 510(c), 544, 548, and 550 of the Bankruptcy Code.

## (Re) Characterization of the Deals

5.      Despite the complexity of the transactions and the multi-layered structure through which the transactions at issue were made, the analysis of the issues here can be simplified.  For purposes of the causes of action here, the Koehler Family Members were the ultimate beneficiaries of the bulk of the wealth inherited upon Raymond Koehler's death.

6.      The Koehler Family Members acted jointly and in concert on all the transactions subject of this action.   They were the beneficiaries of the trusts created that bear their names; they were the owners of the entities used as a means to effect the transactions.

7.      In 2006, the Koehler Family Members, through the Catherine Koehler Trust and the Koehler Family Joint Venture, respectively, transferred approximately $10.7 million in liquid assets to AHF.  The transfers were unequivocally documented as gifts under gift assignment instruments.

8.      In 2007, the Koehler Children's Trusts that were created for the benefit of Mary Schooler, Louise Trammell Conley, Joan Graham, and James Koehler received approximately $10.752 million, ostensibly in repayment or as a return of the sums "gifted" in 2006. Specifically, the Mary Schooler Trust received $3,793,430; the Louise Trammell Trust received $2,712,500; the Joan Graham Trust received $3,161,788; and the James Koehler Trust received $1,084,734.[16]  The transfers were made at the direction of Steve Sterquell and were run through accounts carried in the names of AHF, AHF Development, and the AHF Intermediate Entities.

9.      The 2007 transfers to the Koehler Children's Trusts were also ostensibly made in consideration for or purchase of interests in an entity named GOZ No. 2, Ltd., which interests were conveyed to the RCL Entities.

10.      The 2007 transfers to the Koehler Children's Trusts ostensibly served two

---

[16] *See supra* note 9 regarding the James Koehler Trust.

mutually exclusive purposes: to return or repay the "gifts" made in 2006, and to pay for interests in GOZ No. 2, Ltd.

11.     In 2008, the Koehler Family Members effected another series of transfers to AHF in two transactions: first, they transferred approximately $4.510 million of Bank of America stock to AHF; second, they transferred approximately $4.693 million in liquid assets to AHF. These transfers, like the 2006 transfers, were documented as gifts under simple gift assignments.

12.     At the time the Koehler Family Members made the "gifts,"—both in 2006 and 2008—they each obviously understood what it means to make a gift.  Despite this, they testified that they were promised and thus expected to receive the following as a result of the gifts:

- a return of the gifted assets with at least a 12% return on their investment;

- extraordinary tax benefits in the form of charitable donations and, for the Bank of America stock, the avoidance of capital gains taxes arising from sale of the stock.

13.     As stated, the instruments effecting the transfers were simple gift assignments.  In describing the deals, the Koehler Family Members consistently referred to them as investments. On occasion, they described them as loans.  They refused, however, to characterize them as gifts.

14.     Though the Koehler Family Members refused to acknowledge the gift nature of the threshold transactions, they continued to so characterize them on tax returns filed after Sterquell's death and upon consultation with other professionals.  Within weeks after filing such tax returns, they filed their proofs of claim with this Court that, according to the proofs, maintained that the 2008 transfers were "investments"—but investments that gave rise to claims, not interests in an entity in which they invested.

15.     The Koehler Family Members wanted to accomplish two things.  They wanted to expedite the transfer of their inherited wealth and thus avoid the testamentary trust provisions established by Raymond Koehler, and they wanted to shelter their expectancy of assets from

taxes, including any taxes triggered by the sale of the Bank of America stock.

16.     The Koehler Family Members understood the bottom-line result of what Sterquell promised them. They understood that they put millions at stake, under the guise of gifts, and expected to receive the entire amount back and at an indefinite time, though specified to be "soon"; and at a favorable though unspecified rate of return (though they testified the return was typically 12%); with numerous, wildly beneficial tax advantages. In short, they entrusted their inherited wealth with Sterquell and expected to receive benefits that far exceeded what they had.

17.     The triggering, threshold transactions were characterized as gifts with a major purpose being the avoidance of federal taxes. The Koehler Family Members were not making gifts; they had no donative intent. They knew or should have known that they were engaged in a bogus deal. The false gifts and the tax avoidance scheme, regardless how documented, was the reality of the deals and the reality that they refused to acknowledge.

18.     The Koehler Family Members had little or no understanding of the details of Sterquell's investment scheme; they just knew what they wanted and trusted Sterquell to accomplish their goals. Sterquell no doubt told them that he could accomplish what they wanted and no doubt raised their expectations.

19.     Against this threshold determination, the Court must characterize the nature of the claims made by the Koehler Related Parties. The Court accepts the parties' contentions that the Koehler Family Members did not really intend to make gifts, despite what the documents clearly provide. If such were the case, they would have no claim. The Koehler Family Members said they were investments, but investments that somehow morphed into advances. They contend that, as with a loan, there was not to be any risk of liability on AHF's part. In substance, the deals were falsely documented as a means to effect bogus transactions in furtherance of an illicit

investment and tax scheme orchestrated by Sterquell.

20.     The Fifth Circuit in *In re Lothian Oil Inc.*, 650 F.3d 539 (5th Cir. 2011), held that

bankruptcy courts have the ability to recharacterize debt as equity.

> When a creditor files a timely claim, the Code states that "the court, after notice
> and a hearing, shall determine the amount of such claim ... and shall allow such
> claim in such amount, except to the extent that—(1) such claim is unenforceable
> against the debtor and property of the debtor, under any agreement or applicable
> law...." 11 U.S.C. § 502(b). The Supreme Court has held that the "applicable law"
> is state law: "Congress has generally left the determination of property rights in
> the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S.
> 48, 54, 99 S. Ct. 914, 918, 59 L.Ed.2d 136 (1979). As a result, "there is no reason
> why such [state law] interests should be analyzed differently simply because an
> interested party is involved in a bankruptcy proceeding." 440 U.S. at 55, 99 S. Ct.
> at 918. Our analysis of "applicable law" under § 502(b) is therefore an application
> of state law, unless Congress has stated otherwise.
>
>       Taken together, *Butner* and § 502(b) support the bankruptcy courts'
> authority to recharacterize claims. If a claim asserts a debt that is contrary to state
> law, the bankruptcy court may not allow the claim. Moreover, where the reason
> for such disallowance is that state law classifies the interest as equity rather than
> debt, then implementing state law as envisioned in *Butner* requires different
> treatment than simply disallowing the claim. The Fourth Circuit identified the
> inadequacy of traditional disallowance in noting that "[w]hen a bankruptcy court
> disallows a claim, the claim is completely discharged. By contrast,
> recharacterization is appropriate when the claimant has some rights via-a-vis the
> bankrupt." *In re Dornier Aviation, Inc.*, 453 F.3d 225, 232 (4th Cir.2006) (internal
> citation omitted; emphasis in original). These rights, fixed by state law, are not
> irrelevant to the court's decision to disallow a claim. To the contrary,
> recharacterizing the claim as an equity interest is the logical outcome of the
> reason for disallowing it as debt.

*Lothian Oil*, 650 F.3d at 543.

21.     The Court looks to Texas state law to determine whether the Koehler Family

Members' claims are investments that create, at most, equity claims or true debts that are subject

to treatment as unsecured claims.  *See* 11 U.S.C. § 502(b); *see also Lothian Oil*, 650 F.3d 539.

In this regard, Texas courts have looked to the multi-factored tests from federal tax law cases.

*Lothian Oil*, 650 F.3d at 544. These include a 16-factor test as set forth in *Fin Hay Realty Co. v.*

*United States*, 398 F.2d 694, 696 (3d Cir. 1968); a 13-factor test from *Estate of Mixon v. United*

*States*, 464 F.2d 394, 402 (5th Cir. 1972); and an 11-factor test from *Jones v. United States*, 659

F.2d 618, 622 n.12 (5th Cir. 1981).

      22.     As with other factor-driven tests, the Court reviews the evidence in light of all

factors, "while realizing that the various factors are not of equal significance and that no one

factor is controlling." *Lothian Oil*, 650 F.3d at 544 (quoting *Mixon*, 464 F.2d at 402).

Additionally, the various factors "are only aids in answering the ultimate question whether the

investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to

the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay

Realty*, 398 F.2d at 697.

      23.     Factors considered are the following:

> (1) the intent of the parties; (2) the identity between creditors and
> shareholders; (3) the extent of participation in management by the holder
> of the instrument; (4) the ability of the corporation to obtain funds from
> outside sources; (5) the 'thinness' of the capital structure in relation to
> debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8)
> the relative position of the obligees as to other creditors regarding the
> payment of interest and principal; (9) the voting power of the holder of the
> instrument; (10) the provision of a fixed rate of interest; (11) a
> contingency on the obligation to repay; (12) the source of the interest
> payments; (13) the presence or absence of a fixed maturity date; (14) a
> provision for redemption by the corporation; (15) a provision for
> redemption at the option of the holder; and (16) the timing of the advance
> with reference to the organization of the corporation.

*Id.* at 696. Yet additional factors are the name of the instrument, if any, memorializing the deal,

*Mixon*, 464 F.2d at 402, and the right to enforce payment of principal and interest, *Jones*, 659

F.2d at 622 n.12.

      24.     On a more basic level, the Court notes that creditors and investors are

distinguishable in the way they each view the solvency or insolvency of the enterprise with

which they are dealing. *In re Deep Marine Holdings, Inc.*, No. 10-03116, 2011 WL 160595, *5

(Bankr. S.D. Tex. Jan. 19, 2011). For example, if the enterprise prospers, a creditor expects nothing more than repayment of its fixed debt. *Id*. In fact, the creditors rely on the *equity* provided by the company's investors. *Id*. at *6. Investors, however, look to share in the profits to the exclusion of creditors. *Id*. at *5. The flip side of this expectation is the enhanced risk of insolvency borne by investors. *Id*. The subordination provisions of the Bankruptcy Code, both § 510(b) (mandatory subordination of damage claims arising from purchase of a security) and the absolute priority rule set forth at § 1129(b) of the Bankruptcy Code (providing that "unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated," *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009)), are said to arise from these basic expectations and, thus, the very nature of investments compared to loans. Accordingly, the risk of the illegality in issuance of equity is properly borne solely by investors because "it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors." *Deep Marine*, 2011 WL 160595, at *6 (quoting *SeaQuest*, 579 F.3d at 420).

25.      The Koehler Family Members intended their "gifts" to be investments; they consistently refer to their claims in the AHF bankruptcy case as investments. They falsely claimed they were charitable donations on all tax returns; they expected to recover the amount of their investments with a return, and with an abundance of tax benefits. Their expectation was based on Sterquell's use of the funds within his low-income housing enterprise fronted by AHF. They are charged with knowing that the deals were suspect. It can be inferred that Sterquell intended to use the funds as needed for his enterprise, which consisted of AHF, a claimed non-profit entity sitting at the top of dozens of for-profit entities, all of which were ultimately

controlled by Sterquell. The funds were therefore used within Sterquell's discretion and were not earmarked for any specific usage. A central goal was to avoid the income taxes that result from accumulations and transfers of wealth. The Koehler Family Members did not know or understand precisely what Sterquell intended to do with the funds, but they did know they were placing the funds into Sterquell's control by instruments clearly designated as gift assignments. Despite this, they purposely avoided inquiry with any other professional concerning the propriety and legality of the transactions.

26. As for the identity or relationship between the parties—the Koehler Family Members on one hand and Sterquell (and, by extension, AHF) on the other—the Koehler Family Members were in the role of investors with certain goals and Sterquell was the financial advisor/consultant there to guide them. Sterquell had served certain members of the Koehler family as an accountant and financial advisor for many years. Catherine Koehler, the Schoolers, and Louise Conley trusted him implicitly. Sterquell was charismatic and convincing. His explanations of the deals were vague, ambiguous, and confusing. The Koehler Family Members never understood what he proposed to do with their invested funds. Sterquell was the dominant person in the relationship. As a practical matter, the role of AHF, as a separate legal entity, was as a vehicle for Sterquell's enterprise. In this regard, as stated above, Sterquell was in total control of all aspects of AHF and the entities through which Sterquell's investment schemes were operated. The Koehler Family Members, apart from their investments, had no real control over AHF or its many affiliated entities. The Koehler Family Members no doubt followed Sterquell's advice and relied upon his expertise and promises that he could realize their goals. But they also knew that they were making bogus gifts as part of their investment plan and were thus complicit with Sterquell at the threshold of the deals. Sterquell and the Koehler Family

Members knew the deals were based on promises not grounded in economic reality. Gifts are not loans; charitable donations do not arise from gifts that are not true gifts. Gifts do not give rise to a repayment obligation. Tax deductions that are based on false gifts are illicit. Sterquell no doubt knew this. The deals were risky and improper. Construing the Koehler Family Members' understanding and their intentions most generously, they should have appreciated the illicit nature of the deals and should have sought further professional advice before entrusting their life-changing wealth with Sterquell.

27. Another factor concerns the amount of capital the recipient had at the time of the transaction. If the recipient was capitally thin, then the transaction weighs towards an equity investment. *See Jones*, 659 F.2d at 622; *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 751 (6th Cir. 2001). AHF was an asserted non-profit entity that sat at the top of the enterprise that included dozens of for-profit companies or partnerships. Many of the deals orchestrated by Sterquell were complex and legally questionable. The Court can safely assume that AHF was capitally thin. It is also important to note that the Koehler Family Members' investment funds were controlled by Sterquell (and, by association, arguably AHF) and used for whatever purpose he saw fit.

28. The "risk involved" in a transaction typically considers the presence or lack of security. Absence of security is a "strong indication that the advances were capital contributions rather than loans." *See AutoStyle Plastics*, 269 F.3d at 752. There was obviously no security behind the investments/gifts here. The Koehler Family Members essentially cast caution aside and relied upon assurances from Sterquell that their investments were safe; they also considered the fact that Sterquell had life insurance to cover the investments. They relied upon Sterquell to somehow orchestrate their investments and use the funds in a way that resulted in both a large

return, in the short-run, and with too-good-to-be-true tax benefits. At bottom, they relied upon the solvency of AHF and Sterquell's entire low-income housing enterprise. As was stated in another case before this Court, "[t]he flipside of [the Koehler Family]'s appetite for the basket of benefits is the extreme risk [they] bore through [their] participation." *O'Cheskey v. Templeton (In re Am. Hous. Found.)*, No. 10-02016, 2013 WL 1316723, *15 (Bankr. N.D. Tex. Mar. 30, 2013).

29.     The arrangements' formal indicia are relevant to the inquiry. Though the deals as a whole are incoherent, they begin with gift assignments by which the Koehler Family Members ostensibly gifted their wealth away. There are no true debt instruments, collateral documents, payment terms, maturity dates, or other attributes indicative of an enforceable obligation to repay the sums invested. *See Geftman v. C.I.R.*, 154 F.3d 61, 68 (3d Cir. 1998) (citing *Fin Hay*, 398 F.2d at 696).

30.     The Koehler Family Members' position relative to other creditors of AHF is clearly distinguishable. They expected large returns and huge tax benefits, all under the guise of false gifts. Their benefits were to come back "soon," but there was no fixed sum, at a fixed rate, or a fixed time. The deals do not resemble traditional loans, and they do not resemble the attributes of traditional lenders or creditors.

31.     The Koehler Family Members had no voting rights or similar authority concerning AHF as a result of their investments.

32.     The repayment of the investments and the source of any interest or other return on the amounts invested were to somehow come from Sterquell's use of the funds in his low-income housing projects. In short, the source was wholly based on the legitimacy of what Sterquell pitched. Everything about the deals was vague, ambiguous, and suspect. The

investments were not made at the time AHF was initially organized; they were made at a time that Sterquell needed funds for his continued operations, however.

33.     In assessing the above factors, and upon consideration of the very nature of the investments compared to true loans, the Court concludes that the Koehler Family Members' "investments" were indeed equity investments and must be treated as such in the AHF bankruptcy case. From the perspective of true, legitimate creditors of AHF, the inherent risks from such questionable deals should be exclusively with the ones that blindly followed Sterquell's lead. Such characterization recognizes that the Koehler Family Members put-up real dollars and should have some rights vis-à-vis the bankrupt. *See Lothian Oil*, 650 F.3d at 543. "[It] is the logical outcome of the reason for disallowing it as debt." *Id.*; *see also AutoStyle Plastics*, 269 F.3d at 748–49.

34.     That AHF is an asserted non-profit entity does not alter the Court's conclusion that the claims of the Koehler Related Parties must be relegated to equity claims. AHF was at the top of Sterquell's investment enterprise.

## Subordination of the Claims

35.     Section 510(b) of the Bankruptcy Code mandates subordination of "damages arising from the purchase or sale" of a security of the debtor or of an affiliate of the debtor. 11 U.S.C. § 510(b). "Any discussion of section 510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke, entitled *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973)." *SeaQuest*, 579 F.3d at 420 (quoting *In re Granite Partners, L.P.*, 208 B.R. 332, 336 (Bankr. S.D.N.Y. 1997)). In enacting § 510(b), Congress generally adopted the Slain and Kripke theory of

allocating the risks of insolvency and the unlawful issuance of securities. *See* H.R. Rep. No. 95-595, at 195 (1977); *SeaQuest*, 579 F.3d at 420. Slain and Kripke's "subordination thesis . . . was premised upon the allocation of certain risks between investors and creditors." *SeaQuest*, 579 F.3d at 420. According to the theory,

> "[b]oth investors and creditors accept the risk of enterprise insolvency," but to differing degrees, as reflected in the absolute priority rule. While the creditor anticipates repayment of a fixed debt, the investor anticipates a potentially unlimited share of future profits. In exchange for this "unique right to participate in the profits," the investor risks the loss of his capital investment, which provides an "equity cushion" for the repayment of creditors' claims. In contrast, investors alone bear the risk of illegality in the issuance of securities" because it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors.

*Id.* (citations omitted).

36. In a solvent corporation, the priorities between creditors and shareholders are not significant. *Granite Partners*, 208 B.R. at 337. However, "[w]hen a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion." *Id.* (quoting *In re Stirling Homex Corp.*, 579 F.2d 206, 213 (2d Cir. 1978) (quoting *Newton Nat'l Bank v. Newbegin*, 74 F. 135, 140 (8th Cir. 1896))). Allowing an equityholder to assert an unsubordinated general unsecured claim against a debtor for damages arising from an equityholder's investment would give the equityholder "the best of both worlds—the right to share in profits if [the debtor] succeeded and the right to repayment as a creditor . . . if it failed." *Liquidating Trust Comm. of the Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio)*, No. 12-3065 TEC, 2012 WL 5467754, at *6 (Bankr. N.D. Cal. Nov. 8, 2012) (quoting *In re VF Brands, Inc.*, 275 B.R. 725, 728 (Bankr. D. Del. 2002)).

37.     Section 101(49) of the Bankruptcy Code provides that a security includes any of the types of interests listed. *See* 11 U.S.C. § 101(49). The use of "includes" means that the list is not exhaustive and that securities are not limited to the items listed in § 101(49). *In re Locke Mill Partners*, 178 B.R. 697, 701 (Bankr. M.D.N.C. 1995). In addition, the Fifth Circuit found § 101(49)(A)(xiv), which provides for "other claim[s] or interest[s] commonly known as 'security,'" to be a "broad residual category." *SeaQuest*, 579 F.3d at 418.

38.     The claims of the Koehler Related Parties, based on contract and other related theories, arise from the purchase of the product—the bundle of rights and expectations—from Sterquell and AHF that the Court has recharacterized as equity interests. They cannot assert additional claims to "lay aside the garb" of the equity interests and assume the role of creditors. As investors in bogus deals, they must bear the associated risks. Further, these interests are the type of "other claim[s] or interest[s] commonly known as 'security'" described by § 101(49)(A)(xiv). These equity interests fit into the Fifth Circuit's "broad residual category." In addition, the list in § 101(49) is not exclusive, and the Koehler Family Members' interests are equity interests even if they do not match any of the labels provided. Therefore, any claims made here by the Koehler Related Parties that may be construed to go beyond the basic contract-based claims of their proofs of claim must, under § 510(b), be likewise subordinated.

**Fraudulent Conveyance Charge**

39.     The Trustee contends that the 2007 payments were fraudulent conveyances under either § 548(a)(1) of the Bankruptcy Code as actually fraudulent or § 548(a)(2) as constructively fraudulent.

40.     The 2007 payments were made as a return, at least in part, for the 2006

investments, with the tax deductions serving as additional benefits. The Trustee argues that the 2007 payments to the Koehler Children's Trusts were fraudulent because the entire scheme was part of a Ponzi scheme, thus making all payments actually fraudulent as a matter of law. *See, e.g., Janvey v. Alguire*, 647 F.3d 585, 598–99 (5th Cir. 2011); *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *In re Taubman*, 160 B.R. 964, 982 (Bankr. S.D. Ohio 1993); *Jobin v. Ripley (In re M & L Bus. Machine Co.)*, 198 B.R. 800, 800 (D. Colorado 1996). The Trustee also contends that they are fraudulent because the payments flow to each of the Koehler Children's Trusts and *not* to the Koehler Family Joint Venture, the named party who made the investment in AHF and thus the only party that, technically, may be given credit in the form of an antecedent debt for the 2007 payments. This would therefore make such payments constructively fraudulent as not made in exchange for anything of value, either at the time of or prior to the transfer.

41.     The documents and the labels under which the transactions here were effected have little meaning and frustrate legal analysis. After all, a gift obviously does not create an expectation of recourse against the gift donee. In assessing whether value was received for the 2007 payments, the Court, as it did in defining the nature of the deals, looks to the substance of the transactions.

42.     The Court construes, from the substance, that the Koehler Family Members are both the investors in 2006 and the ultimate transferees in 2007. The question, then, is whether their investments constitute antecedent debt credited against the payments. While the Court stops short of concluding the deals here were, as the Trustee contends, part of a Ponzi scheme, it finds the analysis regarding Ponzi schemes instructive.

43.     With respect to Ponzi schemes, the Eleventh Circuit in *Perkins v. Haines*, 661

F.3d 623, 627 (11th Cir. 2011), stated as follows:

> In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal. Courts have recognized that defrauded investors have a claim for fraud against the debtor arising as of the time of the initial investment. Thus, any transfer up to the amount of the principal investment satisfies the investors' fraud claim (an antecedent debt) and is made for "value" in the form of the investor's surrender of his or her tort claim. Such payments are not subject to recovery by the debtor's trustee. Any transfers over and above the amount of the principal—i.e., for fictitious profits— are not made for "value" because they exceed the scope of the investors' fraud claim and may be subject to recovery by a plan trustee.

*Id*. (internal citations omitted).  The *Perkins* court rejected the argument made there that the general rule—that value is given by the investor up to the amount of the investment—should not apply where the investors hold only an equity interest in an insolvent debtor as opposed to a situation involving defrauded investors that hold "claims against the instrument of the fraudulent scheme either in tort law or through some sort of contractual arrangement."  *Id*. at 627–28.  The court held that "[t]he general rule applies in a Ponzi scheme setting regardless of whether good faith investors have an equity interest in, or some other form of claim against, the legal entity constituting the instrument of the fraud."  *Id*. at 628–29.  The Eleventh Circuit's holding in *Perkins* is in accord with the general notion, as expressed by the Fifth Circuit in *In re Hannover Corp.*, 310 F.3d 796 (5th Cir. 2002), that §§ 548(a) and (c) are complementary.  "The first section affords creditors a remedy for the debtor's fraudulence or, as the case might be, mere improvidence; the second protects the transferee from his unfortunate selection of business partners."  *Hannover*, 310 F.3d at 802.

44.    The investments made by the Koehler Family Joint Venture constitute antecedent debt for purposes of the 2007 payments *to* the Koehler Children's Trusts.

**Disposition**

45.     The Court has determined that the payments made in 2007 on the 2006 investments were, in effect, made by AHF.  Regardless, the Court has likewise determined that the investments constitute antecedent debt and thus value given in return for the payments.

46.     Given the Court's recharacterization of the Koehler Related Parties' claims and determination that they must be subordinated to general unsecured creditors, the Court need not address the balance of the issues before the Court arising in this part of the adversary proceeding.

47.     The issues raised in this matter raise mixed questions of fact and law. Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

### End of Findings of Fact and Conclusions of Law ###